# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 4, 2013 Session

## IN RE: MARIA B. S. ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 3-410-10      Wheeler Rosenbalm, Judge**

**No. E2012–01295-COA-R3-PT - Filed April 1, 2013**

Matthew V. and Carlene V. ("the Foster Parents") filed a petition in the Circuit Court for Knox County ("the Trial Court") seeking to terminate the parental rights of Lewis S. ("Father"), father to the minor twin children Maria B. S. and Anna J. S. ("the Children"). After a trial, the Trial Court terminated Father's parental rights to the Children after finding that grounds for termination pursuant to Tenn. Code Ann. §§ 36-1-113 (g)(1), (g)(3), and (g)(9) had been proven by clear and convincing evidence, and that clear and convincing evidence had been shown that it was in the Children's best interest for Father's parental rights to be terminated. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Robin Gunn, Knoxville, Tennessee, for the appellant, Lewis S.

N. David Roberts, Jr., Knoxville, Tennessee, for the appellees, Matthew V. and Carlene V.

# OPINION

## Background

The Children, twin girls, were born in January 2010. The Children's mother, Kimberly S. ("Mother"), was incarcerated at the time of their birth. Mother was brought to the hospital temporarily for the birth of the Children. The Children soon thereafter were removed by the Department of Children's Services ("DCS") based on dependency and neglect. Mother later voluntarily surrendered her parental rights to DCS. DCS placed the Children with the Foster Parents in February 2010, while DCS retained legal custody of the Children pursuant to court order. In August 2010, the Foster Parents filed a petition to adopt the Children and to terminate Father's parental rights. This matter was tried in July 2011.

Father, age 43, testified first. Father gave his testimony remotely from prison. Father had been unemployed since 2007. Father acknowledged having a lengthy criminal history, including assaults, DUIs, and drug charges. Father stated that he would be released from incarceration in three months. Before he went to prison in August 2009, Father subsisted on Social Security disability payments of $674 per month. Father's disabilities were a steel pin in his leg, steel plates in his wrist, and bipolar disorder. The disability checks stopped when Father was incarcerated. Father stated that he would try to regain his disability payments upon his release. Father stated that when he was released, he would stay with relatives until he got situated. Father testified that his old landlord would let him have his old place back and that Father learned this through his sister.

Continuing with his testimony, Father elaborated on his background. Father had a relationship with Mother for about six months. Father began seeing Mother while he was married to another woman. Father learned Mother was pregnant around April 2009. Father went to prison after having assaulted another one of his girlfriends in a parking lot while Mother was pregnant. This girlfriend had an order of protection against Father. Father testified that he knew the order of protection was still in effect when he beat the girlfriend. Father further acknowledged that in 1997, his mother took out an order of protection against him. As to any other offspring, Father testified that he might be the father of twin males born in the 1980s. Father never took any steps to investigate or assert his paternity to the twin males.

Father had written no letters to DCS inquiring about the Children, who suffered from a variety of health ailments including, according to Father, allergies and Hepatitis C. Father did not make phone calls to ask about the Children either. Father did, however, manage to make some calls to his sister.

Father testified about his commissary account. When he worked, Father was paid approximately $20 per month. Father worked from three to twelve months. Father sent none of that money to the Children. Father stated "I guess I could have sent ten dollars a month [to the Children]" but "I don't know the process of sending it out, really." Father testified that he never asked about how to send money to the Children. Father stated that he did take a child support education program while incarcerated.

Father stated that he learned the results of a DNA test verifying his paternity of the Children sometime around July 2010. Father took no steps to have himself declared as the legal father of the Children, but he stated that DCS never helped him with any steps. Father stated that he asked perhaps "once" about it. As of trial, Father's name still was not on the Children's birth certificates. Father testified that he told DCS he wanted custody of the Children, or, in the alternative, for his sister to have custody until he could get established. Father testified that his sister already had four children living in her home and that she was a single mother.

Jessica Hume ("Hume"), a foster care worker, testified. Hume had worked the Children's case since January 2010, beginning soon after the Children's birth. Hume testified that Mother did not even name the Children, and DCS brought them into its custody. The Children were placed with the Foster Parents. Mother initially declined to identify the father of the Children. Hume first learned of Father in May 2010 when Father's sister informed her of her suspicion that Father was the Children's father. Hume met with Father a number of times. Father told Hume that he wanted his sister to have custody of the Children while he established himself. Hume reviewed a permanency plan with Father. Father, for his part, sent Hume a certificate showing that he completed an anger management course. Hume testified that the Children are doing well with the Foster Parents. In 2010, a home study was done on Father's sister's home, which yielded a favorable conclusion. Hume testified that Father had provided nothing to her prior to trial about housing for the Children.

In August 2011, the Trial Court entered an order terminating Father's parental rights. Father appealed, arguing that the Trial Court's order lacked specificity as to which grounds for termination were found. This Court, in *In re Maria B. S.*, E2011-01784-COA-R3-PT, 2012 WL 1431244 (Tenn. Ct. App. April 25, 2012), *no appl. perm. appeal filed*, *inter alia*, remanded this case to the Trial Court with instructions for it to enter an order clearly specifying which grounds for termination were found.

In June 2012, following our Opinion, the Trial Court entered a thorough and detailed order terminating Father's parental rights to the Children pursuant to Tenn. Code Ann. §§ 36-1-113 (g)(1), (g)(3), and (g)(9). The Trial Court found, by clear and convincing

evidence, eight distinct grounds for termination. We quote extensively from the Trial Court's detailed order, in relevant part:

[Abandonment – Tenn. Code Ann. § 36-1-113 (g)(1)]
[1. Tenn. Code Ann. § 36-1-102 (1)(A)(i) – willful failure to support]

24. During the four months preceding the filing of the petition from April 12, 2010 until August 12, 2010, [Father] contributed not a single penny towards the support of the children. Moreover, he did nothing towards positioning himself to discharge his obligation to care for and support the children. He was told by the mother early in her pregnancy that he was the father. Yet the department, not [Father], undertook to arrange the DNA testing following their birth to determine his parentage of the twins. He is presumed by law to have knowledge of his responsibilities to the children yet did nothing.

25. The July, 2010 permanency plan provided that: the parent (father) will make a good faith payment of $40.00 per month which needs to be sent to: Central Child Support Receipting Unit, P.O. Box 305200, Nashville, TN 37229. A telephone number of 862-0366 was also provided. Despite the legal obligation to pay support and the permanency plan requirement of a good faith effort at providing support nothing was done.

26. Despite his support obligation, [Father] contributed not one single penny towards the support of his children. He is presumed by law to have knowledge of his responsibilities to these children, and in fact, while incarcerated, he took a class and received a certificate for child support education. To do nothing as he did, after being educated about his obligations, clearly and convincingly, demonstrates that [Father's] failure to support his children was willful. From [Father's] testimony, his sole excuse for not contributing towards the support of his children was that he did not know where to send the money. In the opinion of the Court that excuse is entitled to no weight or credibility. The Court regards [Father's] excuse as an afterthought.

***

[2. Tenn. Code Ann. § 36-1-102 (1)(A)(ii) –
failure to provide a suitable home]

28. The evidence also establishes, clearly and convincingly, that [Father] abandoned his children within the meaning of Tenn. Code Ann. § 36-1-102(1)(A)(ii). The children in this case were born on January 1, 2010. At the time of their birth, their mother and their father were both incarcerated.

-4-

[Father] was in a prison in Morgan County, and the mother was in jail in Knox County. The children's mother was taken to the hospital from jail to give birth to the children and was immediately returned to jail. At the time of their births she declared that she did not want the children and shortly after their birth, upon her release from jail, she surrendered them to the department. Upon the department's petition filed for custody, the children were declared dependent and neglected by the Knox County Juvenile Court on February 24, 2010 and placed into foster care. The mother had told [Father] that she was pregnant with his children in April, 2009 but [Father] was not further identified as the father until May, 2010 when [Father's] sister advised the department that she thought that her brother, [Father], was possibly the father of the children. The department requested that [Father] submit to DNA testing. The DNA report results are dated July 3, 2010. Upon receipt of the evidence establishing [Father] as the father the department contacted [Father] in prison and undertook to help him discharge his responsibilities as the children's father including establishing himself as their legal parent. The department's worker provided [Father] with a permanency plan and a copy of the *Criteria & Procedures for Termination of Parental Rights* which he acknowledged with his signature on July 15, 2010. At the last meeting with the father at the prison in July, 2011, she left an open invitation with [Father] to enable him to contact her when he needed any assistance in performing those tasks that were outlined in the permanency plan that the department has developed for him. 29. On January 24, 2011, [Father] sent the case worker a certificate indicating that he has completed an anger management class on June 24, 2010. Otherwise, the department did not hear from [Father]. He has done absolutely nothing to indicated [sic] that he is concerned about being a suitable parent to his children and providing them with a suitable home.

30. The Court finds, based upon clear and convincing evidence, that [Father] has demonstrated a lack of concern for his children to such degree that [it] appears unlikely that he will be able to provide a suitable home for them at any time. The department's efforts to assist [Father] exceeded the efforts he made to comply with the permanency plan.

\*\*\*

[3. Tenn. Code Ann. § 36-1-102 (1)(A)(iv) – wanton disregard]

33. Even prior to the birth of his children, [Father] had a long history of criminal offenses and prior jail and prison incarcerations that involved domestic violence and aggravated assault, including court orders of protection against him, drug offenses, public intoxication, driving under the influence, and conviction as a habitual motor vehicle offender. [Father] was made aware early in his girlfriend's pregnancy that she believed that he was the father. With this information, a reasonable person would have begun preparations to become a parent. Instead of preparing to become a father, [Father] reconnected with a past girlfriend, a girlfriend who held an active order of protection against him. In the process of reestablishing this other relationship he violated the active order of protection by committing an assault against her and again became incarcerated and was sent to prison. As a result of those actions and his incarceration the birth mother became homeless during the remainder of her pregnancy and was living on the streets. During that time she resumed engaging in prostitution to support herself. At the time of the birth of the children she was in jail on a pending prostitution charge. Upon their birth the mother abandoned the children at the hospital without naming them and subsequently surrendered them to the Dept. of Children's Services for adoption. These events were all a direct consequence of the alleged father's actions. Clearly this conduct evidences a wanton disregard for the welfare of the children.

34. However, once incarcerated and after DNA proof of his parentage was provided to him by the department, [Father] gained a second opportunity to prepare himself to be a parent. The DCS worker arranged to meet with him on three (3) occasions in order to assist him in preparing for providing a home for his children upon his release . . . Despite her offers of assistance [Father] only made a single communication back to her, that communication being the mailing to her of a single prison class completion certificate. No letters were sent to the department or to the children from [Father] . . . .

\*\*\*

[Persistent Conditions]
[4. Tenn. Code Ann. § 36-1-113 (g)(3) – persistent conditions]

41. As noted previously, [Father] made no preparation before the birth of the children to act as parent. On the contrary he abandoned the mother and acted in a manner that led to incarceration. Following his incarceration, [Father] again made little meaningful effort to prepare to act as a parent for the children or to prepare upon his release from prison to assume the role of a responsible

parent. The conditions which led to the removal of the children, resulting in them being declared dependent and neglected, continue to exist, and [Father] has made no progress towards the remedying of those conditions and preparing to parent the children upon his release from prison, and his lack of progress is preventing the children from being placed in a permanent, safe and stable adoptive home.

\*\*\*

[Grounds Pertaining to Putative Fathers –
Tenn. Code Ann. § 36-1-113 (g)(9)]

[5. Tenn. Code Ann. § 36-1-113 (g)(9)(A)(ii) –
failure to make reasonable payments]

In this case, the alleged father testified that he earned money from employment while incarcerated, that he did not make any attempt to supply any of those funds to the State of Tennessee, to assist in the care of his children, and that he did not consult with the DCS worker about assisting him in remitting child support payments for the benefit of his children. Further, the address for making child support payments for his children was contained in the permanency plan developed for the children by DCS and supplied to the alleged father by the DCS worker. As already discussed above, [Father] gave no sufficient legal reason or excuse for his willful failure to support his children with the resources available to him. [Father] never paid a penny towards the support and maintenance of his children.

\*\*\*

[6. Tenn. Code Ann. § 36-1-113 (g)(9)(A)(iv) – failure to
manifest an ability and willingness to assume
legal and physical custody of the child]

The department gave [Father] written guidelines concerning the legal grounds to terminate parental rights. In this case, the department instituted the DNA testing upon the alleged father and determined that the alleged father was, in fact, the biological father of the children. The department than gave him that information. The alleged father never acted upon the information and never undertook any steps, even after being appointed legal counsel, to pursue the establishment of a legal relationship with the children. The alleged father testified that his plan of care for the children before his release and after his

-7-

release, until he could get on his feet, would be through his sister, or through other relatives. However, none of the alleged father's relatives intervened in the adoption proceeding, even though his sister did testify on his behalf at trial. His actions in regard to these two female twin children are consistent with his actions related to prior alleged twin male children, now grown, that [Father] suspected were his. In the same manner as the girl twin children, he never undertook to determine if the male twins were his or to establish any legal relationship with those twin boys that he, and his family, suspected were his. Although he maintained some type of relationship with them, it does not appear that is rose to the level of a parental relationship. [Father] has willfully failed to pursue the opportunity to be a responsible parent and father not only once during his lifetime, but now twice.

***

[7. Tenn. Code Ann. § 36-1-113 (g)(9)(A)(v) – placing custody
of the child with the parent would pose risk of substantial harm
to physical or psychological welfare of child]

In this case, the alleged father has a history of criminal charges, drug charges, and domestic violence charges, including the violation of an order of protection that sent him to prison. Both children were born with hepatitis C, and suffer from serious health issues. The alleged father has not shown himself to be capable of caring for children that have special needs, which includes regular medical care. The alleged father does not possess a valid driver's license which would enable him to provide transportation to the children's numerous medical appointments. Although he testified that his family would be supportive of him and would assist him with raising the twins, only his sister appeared at the trial and testified. The sister did not intervene in the proceedings, nor did any other relative.

***

[8. Tenn. Code Ann. § 36-1-113 (g)(9)(A)(vi) – failure to
establish paternity within thirty days of notice of
alleged paternity by the child's mother]

In this case, the birth mother had made the alleged father aware of her pregnancy early on and the likelihood that he was the father. The Dept. of Children's Services subsequently conducted DNA testing and determined that

the alleged father was the biological father of the children. Despite his knowledge of these facts, the respondent never sought to establish a legal relationship with the children. Even when appointed legal counsel, [Father] did not pursue the establishment of any legal relationship with the children. (internal citations omitted)

The Trial Court also found, by clear and convincing evidence, that it was in the Children's best interest that Father's parental rights be terminated, stating in part:

(d) There was unrefuted testimony that the children are bonded to [the Foster Parents], the prospective adoptive parents, and that the children have been well cared for in their home, including the meeting of their severe and special medical needs. The children have not lived with any other family since placement with [the Foster Parents] in February, 2010. The children are now more than two years old. Any change to their placement could be detrimental to their physical and/or emotional health. The children are doing well in [the Foster Parents'] home, especially when considering their traumatic starts in life. There was no negative testimony about [the Foster Parents'] home, about their placement there or any question about their commitment to these children. Instead the proof is clear and convincing that this is a loving and appropriate home for these children.

(e) The Court finds that the alleged father comes before the Court with a history of personal problems and issues. Prior to these children's birth [Father] failed to determine his possible parentage to two other male twin children despite personal and family suspicions that they were his children. Although under treatment now, [Father] claims to suffer bi-polar mental illness and certain disabilities which prevents him from working. Although he plans to try and re-establish his disability income after his release from prison it is unknown if he will be successful in doing so. Upon his release from prison, [Father] will not possess a valid driver's license and without such managing his children's illnesses and numerous medical appointments will be extremely difficult. Although the alleged father testified that he would utilize his relatives to care for his children during his absence and upon his release from prison, no relative of the alleged father sought to intervene in this [sic] proceedings, including the sister who testified on his behalf.

Father timely appealed to this Court.

**Discussion**

We consolidate the issues Father raises on appeal as follows: 1) whether the Trial Court erred in erred in finding and holding that clear and convincing evidence existed to terminate his parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1); 2) whether the Trial Court erred in finding and holding that clear and convincing evidence existed to terminate his parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(3); and, 3) whether the Trial Court erred in finding and holding that clear and convincing evidence existed to terminate his parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(9). While Father does not raise this issue, we nevertheless will address whether the Trial Court erred in finding by clear and convincing evidence that it was in the Children's best interest for Father's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be

-10-

terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Regarding abandonment, Tenn. Code Ann. § 36-1-113 (g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113 (g)(1) (Supp. 2012). As pertinent to this appeal, Tenn. Code Ann. § 36-1-102 provides:

-11-

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parents(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or

guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or . . . .

***

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child; . . . .

Tenn. Code Ann. § 36-1-102 (1) (2010).

Tenn. Code Ann. § 36-1-113(g)(3), the ground concerning persistent conditions, provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
    (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
    (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
    (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2012).

As to the grounds for termination of parental rights concerning putative fathers, Tenn. Code Ann. § 36-1-113 (g)(9) provides:

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c)

-13-

may also be terminated based upon any one (1) or more of the following additional grounds:

(i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(C);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3); . . . .

Tenn. Code Ann. § 36-1-113 (g)(9)(A) (Supp. 2012).

We now address whether the Trial Court erred in finding and holding that clear and convincing evidence existed to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1). Specifically, the Trial Court found three distinct grounds of abandonment: willful failure to support, failure to provide a suitable home, and wanton disregard.

From our review of the record, Father has been immensely uninvolved in the lives of the Children, to say the least. We are cognizant that Father was incarcerated from the time of the Children's birth through trial, but, even in light of that enormous obstacle,

Father was glaringly detached from the Children's lives. Remarkably, Father testified that he earned money in prison and could have sent some small amount for the Children's support but never sent *any* to the Children because he did not know how. Father never bothered to inquire as to how. We agree with the Trial Court that Father's excuse is a mere "afterthought." Having earned only around twenty dollars per month in prison, it would be understandable if Father's contributions to supporting the Children were quite small. However, Father's failure to provide *any* support to the Children despite having earned at least some small amount of money, and, with no credible explanation as to why he failed even to attempt to fulfill this basic parental duty, demonstrates willful failure to support.

With respect to failure to provide a suitable home, we note that the Children were not removed from Father's home. Moreover, the Trial Court's order with respect to this issue generally does not track the relevant statutory language. We acknowledge the impediment posed by prison to Father establishing a suitable home for the Children. From the record before us, and despite his general non-involvement with the Children, we cannot conclude that the Foster Parents met their burden with respect to the ground of failure to provide a suitable home by clear and convincing evidence.

Finally with respect to abandonment there is the ground of wanton disregard. As this Court stated in *In re: Audrey S.*: "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re: Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). With regard to this ground, the most pertinent fact in the record is that of Father's assault on his former girlfriend. Father admitted to striking this former girlfriend, despite her having an order of protection against him, and, additionally, despite Mother's being pregnant with the Children. While the Children were not yet born at the time of this assault, these acts by Father led to his incarceration which created a serious barrier to his fulfilling his duties as a parent to the Children. Father's assault resulting in his incarceration represents wanton disregard for the welfare of the Children.

From our review of the record before us, we find that the Trial Court's findings, apart from those concerning the ground of failure to establish a suitable home, made under the clear and convincing standard as relevant to this issue of abandonment are supported by a preponderance of the evidence. The Trial Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) and Tenn. Code Ann. § 36-1-102 (1)(A)(i) and (iv).

We next address whether the Trial Court erred in finding and holding that clear and convincing evidence existed to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(3). Father argues that this ground could not be applied to his case as the Children were not removed from his home by order of a court. "The child has been removed from the home of the parent or guardian by order of a court. . . ." Tenn. Code Ann. § 36-1-113 (g)(3) (Supp. 2012).

We agree with Father as to this issue. Father was incarcerated at the time of the Children's birth. No one removed the Children from Father–he never had the Children in the first place. There is case precedent to support Father's position that, without removal from that parent's home, the ground of persistent conditions is inapplicable. *See In re T.L.*, No. E2004-02615-COA-R3-PT, 2005 WL 2860202, at *7 (Tenn. Ct. App. Oct. 31, 2005), *Rule 11 appl. perm. appeal denied Feb. 17, 2006*; *In re D.L.B.*, No. W2001-02245-COA-R3-CV, 2002 WL 1838147, at *9 (Tenn. Ct. App. Aug. 6, 2002), *rev'd on other grounds*, 118 S.W.3d 360 (Tenn. 2003); *In re B.P.C.*, M2006-02084-COA-R3-PT, 2007 WL 1159199, at *7 (Tenn. Ct. App. April 18, 2007), *no appl. perm. appeal filed*. The Foster Parents offer no compelling counterargument, and we decline to depart from this precedent. The Trial Court erred in finding and holding that clear and convincing evidence exists to terminate Father's parental rights under the ground of persistent conditions.

We next address whether the Trial Court erred in finding and holding that clear and convincing evidence existed to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(9). The facts relevant to the grounds under this part are clear. Father never has established his paternity of the Children in law. Nevertheless, Father has been aware of his paternity of the Children since early 2009. Despite earning some small amount of money in prison, Father has failed to remit any amount of support to the Children. Father has not communicated with the Children. Father has done virtually nothing of substance towards becoming a proper parent. On appeal, and throughout this case, Father has asserted that his sister can take care of the Children while he establishes himself in society. This, however, simply does not pass muster. Father has shown zero ability to care for the Children, and his claimed willingness to do so rings hollow.

From our review of the record before us, we find that the Trial Court's findings made under the clear and convincing standard as relevant to this issue are supported by a preponderance of the evidence. The Trial Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113 (g)(9) (ii), (iv), (v), and (vi).

Finally, we address whether the Trial Court erred in finding by clear and convincing evidence that it was in the Children's best interest for Father's parental rights to be terminated. As pertinent to this issue, Tenn. Code Ann. § 36-1-113 (i) provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i) (Supp. 2012).

The record reflects that the Children are in a caring, stable foster home and have received treatment for their severe medical needs. On the other hand, there is virtually

-17-

nothing in the record to suggest that Father is or will be in any position to serve as a suitable father to the Children. On the contrary, Father has proven to be amazingly indifferent and indolent when it comes to fulfilling his responsibilities as a parent. The evidence in the record on appeal does not preponderate against the Trial Court's findings made by clear and convincing evidence that it is in the Children's best interest for Father's parental rights to be terminated. We affirm the Trial Court's finding that it is in the best interest of the Children for Father's parental rights to be terminated.

We find and hold that, apart from its reliance on the grounds of persistent conditions and failure to provide a suitable home, which we modify, the Trial Court did not err in terminating Father's parental rights to the Children. We, therefore, affirm as modified the Trial Court's judgment terminating Father's parental rights to the Children.

## **Conclusion**

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Lewis S., and his surety, if any.

_____
D. MICHAEL SWINEY, JUDGE